UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LIAN MING LEE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:09-cv-0024 |
| | § | |
| TAIPEI ECONOMIC AND CULTURAL REPRESENTATIVE OFFICE, | § § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Pending before the Court is Defendant's Motion to Dismiss and Memorandum in Support (Doc. No. 16). After considering the parties' filings, all responses and replies thereto, and the applicable law, the Court finds that the Defendant's motion should be denied.

### I.   BACKGROUND AND PROCEDURAL HISTORY

This suit involves claims of age discrimination in the workplace.[1]  Defendant, a foreign state, moves to dismiss the case, urging that the court does not possess subject matter jurisdiction over the case due to the state's sovereign immunity. Plaintiff acknowledges that foreign states normally enjoy sovereign immunity from suit under the Foreign Sovereign Immunities Act ("FSIA"), Pub. L. No. 94-583, 90 Stat. 2891 (codified as amended in scattered sections of 28 U.S.C.). Plaintiff argues, however, that Defendant does not enjoy immunity in this case because it is subject to the statutory "commercial activity" exception contained in 28 U.S.C. § 1605(a)(2). (*See* Order, Doc. No. 32, at 2-4.) After examining the pending motion in an earlier Order (*see* Doc. No. 32), the Court

---

[1] The facts of this case, which are largely undisputed, are described in the Court's previous order on the pending motion (*see* Doc. No. 32). The Court will include relevant background facts where necessary.

1

ordered discovery to satisfy its analysis that it has subject matter jurisdiction over this matter.[2] *See Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 849 (5th Cir. 2000) (citing *United States v. Moats*, 961 F.2d 1198, 1203 (5th Cir. 1992)).

## II.  ANALYSIS

Where an employee has sued a foreign state, courts are interested in the question of whether the employee was a civil servant of the foreign state, and often base their immunity holding at least partly on the outcome of that question. Many courts have taken the view, based on legislative history, that a foreign state's civil service and diplomatic employees do not qualify for the "commercial activity" exception. *See El-Hadad v. United Arab Emirates*, 496 F.3d 658, 664 (D.C. Cir. 2007) (collecting cases). The legislative history in question elaborates on what kind of activity may strip away a foreign state's immunity under the "commercial activity" exception. It states that "public or governmental and not commercial in nature, would be the employment of diplomatic, civil service, or military personnel," while "employment of engagement of laborers, clerical staff, or public relations or marketing agents" is commercial and not governmental in nature. H.R. Rep. No. 94-1487, at 16 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6604, 6615.

Though all courts appear to consider the question of whether an employee of a foreign state is a civil servant, courts give different weight to that determination. The D.C. Circuit has adopted a two-stage approach whereby it first considers the operative question of whether a plaintiff is a civil servant. If the answer to that question is

---

[2] In addition to its FSIA argument, TECRO also initially claimed that it enjoyed absolute immunity under the 1980 American Institute of Taiwan-TECRO Agreement, in conjunction with the International Organization Immunities Act, 22 U.S.C. § 288a. TECRO subsequently withdrew this argument (Def.'s Advisory to the Court Regarding Def.'s Mot. to Dismiss, Doc. No. 30), and so the Court need not consider it. The only ground upon which Defendant now moves to dismiss is its FSIA immunity claim.

affirmative, the court then moves on to the ultimate question of whether the civil servant's activity is commercial and thus may qualify for the FSIA's "commercial activity" exception. *El-Hadad*, 496 F.3d at 664 & n.2. The Second Circuit considers a plaintiff's civil servant status only an "'example[]'" to be used in deciding the "'central'" commercial/governmental question. *Id.* at 664 n.2 (quoting *Kato v. Ishihara*, 360 F.3d 106, 111 (2d Cir. 2004)). The Seventh Circuit blends the question of civil service status and commercial activity together "such that exercises of peculiarly governmental power become the chief mark of a civil servant, while exercises of power common to private citizens mark a commercial employee." *Id.* (citing *Segni v. Commercial Office of Spain*, 835 F.2d 160, 164-65 (7th Cir. 1987)). The Ninth Circuit considers an employee's civil service status to "supersed[e] the commercial/governmental distinction." *Id.* (citing *Holden v. Canadian Consulate*, 92 F.3d 918, 921 (9th Cir. 1996)). Neither the Fifth Circuit nor this Court has previously ruled on the question.

      The Court finds the approach of the D.C. Circuit persuasive. The two-stage approach addresses the immunity inquiry from several important perspectives, in particular by taking into account a foreign government's own categorization of its employees, and by not doing away entirely with the core statutory question of whether the relevant activity is commercial or governmental in nature. Thus, the Court will take up the operative question of whether Lee was a civil servant of Taiwan. If he was a civil servant, the Court's "analysis stops for [it] has determined" Taiwan is immune from suit. *Id.* at 664. If, however, the Court does not find that Lee was a civil servant, it will go on to consider whether Lee's job activities at TECRO were commercial in nature. This inquiry requires the Court to examine whether Lee's work involved the exercise of

"'powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns.'"  *Id.* at 664 (quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993)).

### A.  Is Lee a Civil Servant?

The FSIA does not define "civil service," and various courts have noted the problem of using our own country's idea of civil service in order to derive a workable definition.  *See, e.g.*, *Kato v. Ishihara*, 360 F.3d 106, 113 (2d Cir. 2004) ("[C]haracteristics of American civil service employment today . . . do not necessarily resolve the question whether a particular employment relationship is an example of 'civil service.' Other countries are free to structure employment relationships in ways that do not mimic civil service protections now common to the United States and many European states, without thereby sacrificing the immunity conferred by the FSIA . . . ."); *El-Hadad*, 496 F.3d at 664.  Whereas American civil service has certain features, such as competitive examinations and job security, it is not wise to expect that foreign governments will shape their civil services in the same fashion. This Court agrees that the best course is to "take a flexible and inclusive approach to determining whether a foreign government's employee is a civil servant." *El-Hadad*, 496 F.3d at 665.  The Court was unable to determine whether Lee was a Taiwanese civil servant from the original briefings on the motion to dismiss.  Therefore, it ordered limited discovery by posing a number of questions to the parties aimed at understanding whether Lee was a civil servant of Taiwan while employed at TECRO.  The list of questions posed was not exhaustive, but was aimed generally at understanding both Taiwanese law and Lee's role at TECRO.  The evidence is split on some factors, making this a difficult consideration.

TECRO bears the burden of proof of showing that Lee was employed as a civil servant. *Id.* (citing *Princz v. F.R.G.*, 26 F.3d 1166, 1171 (D.C. Cir. 1994)).

### 1. How does Taiwanese law define civil service?

Responding to this question, TECRO first offers information as to what it means to be a "public official." TECRO asserts that, under Taiwanese law, a public official is a person in one of the following categories who exercises public duties under law or other governmental authority:

    1. Those who serve a department of the State or a local government with legal function and power, and others who are engaged in public affairs in accordance with law with legal function and power.

    2. Those who, entrusted by a department of the State or local government, are engaged according to law in the discharge of the trusted public affairs that are within the power of the said department or local government.

(Def.'s Resps. to Limited Disc., Doc. No. 35, at 1.) TECRO confirms that it considers the terms "public official" and "civil servant" to be analogous.

In offering its definition of "public official," TECRO makes no attempt either to show that the terms "public official" and "civil servant" mean the same thing, or, more importantly, that Lee fits under one of these two categories. TECRO simply lists the two categories and asserts that, as a chauffer, Lee was a member of the service staff for TECRO. This information does not paint a clear picture to the Court of how Taiwanese law defines civil service, and undoubtedly does not show that Taiwanese law defines Lee as a civil servant.

Next, TECRO refers to several rules and regulations that applied to Lee's position at TECRO. First, TECRO references the Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95, and the Vienna Convention on Consular

5

Relations, Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261.  These two treaties contain definitions relating to the service staff and consular staff of diplomatic missions.  The Vienna Convention on Diplomatic Relations has a definitions section stating that "'members of the service staff' are the members of the staff of the mission in the domestic service of the mission."  Vienna Convention on Diplomatic Relations art. 1(g).  Similarly, the Vienna Convention on Consular Relations states that "'member of the service staff' means any person employed in the domestic service of a consular post."  Vienna Convention on Consular Relations art. 1(f).  TECRO states that the Taiwanese Ministry of Foreign Affairs follows these conventions, and under its own rules, classifies positions at the various diplomatic posts on the basis of job responsibilities.  Lee's position was "chauffer," and he was a member of the service staff for TECRO—"Supporting Foreign and Civil Services."  (Doc. No. 35, Ex. 1, ¶ 5.)

In presenting all of the foregoing treaties, rules, and regulations, all that TECRO manages to accomplish is establishing that Lee's position was classified in certain ways.  Under both the Vienna Convention on Diplomatic Relations and the Vienna Convention on Consular Relations, Lee was considered a member of the service staff.  How Lee's position is treated under the Vienna Conventions, however, is irrelevant to this Court's view on civil service.  Both conventions seek to classify all employees on diplomatic and consular premises, but mere classification does not elevate an employee's status to that of a civil servant.  The Vienna Conventions classify every person working at diplomatic posts so that they may define precisely which employees enjoy diplomatic and consular immunities and other privileges, a consideration not relevant to the Court's inquiry here.  *See, e.g.*, Vienna Convention on Diplomatic Relations art. 31; Vienna Convention on

6

Consular Relations art. 43.  Vienna Convention classification does not establish whether an individual is a civil servant.

Under the rules of the Taiwanese Ministry of Foreign Affairs, Lee's position was included in the position classification system.  It is clear that Lee's position was an official one, recognized by TECRO and the Taiwanese Ministry of Foreign Affairs.  This does not prove, however, that Lee was a civil servant.  As noted above in reference to the Vienna Conventions, both TECRO and the Taiwanese Ministry of Foreign Affairs have reasons to classify every position in the TECRO office, whether or not the person is a civil servant.  Regardless of rank, every employee in the office receives his salary from the Taiwanese government.  As an employer, the Taiwanese Ministry would have to keep track of Lee for certain purposes regardless of whether he was a civil servant, such as salary and benefits determinations, personnel hiring and firing, and task assignments.  Inclusion in the Taiwanese Ministry's classification system does not prove to the Court that Taiwanese law defines civil service to include Lee's position.

In response to the same question, Lee submitted a translated copy of Taiwan's Civil Service Employment Act ("CSEA"), which governs the employment of civil servants.  (Pl.'s Answers Posed by Court's Order of Dec. 8, 2009, Doc. No. 34, Ex. 1.) Lee points to two clauses that establish that Lee's position was not one covered by the Act. First, in explaining the civil service, Article 6 of the act states, "The guidelines for assigning the job titles and ranks, and number of personnel per grade . . . shall be determined by the Examination Yuan in consultation with the Executive Yuan."  (Doc. No. 34, Ex. 1, at 2.)  Lee argues that the term "examination" appears throughout the statute, but he was never required to take an examination to obtain his job.  He also

7

asserts that there are no special qualifications or rank promotion requirements that would apply to Lee's job of driving and ordinary manual labor.  Second, Lee points to Article 2 of the CSEA's Enforcement Rules, which defines "civil service" as "the personnel whose job titles, ranks and grades are determined in accordance with the organic laws of each respective agency, with the exception of the political appointees and the popularly-elected officers."  (Doc. No. 23, Ex. 1, at 17.)  Lee maintains that his position does not qualify as civil service under this definition.

The Court acknowledges that Article 6 of the CSEA does mention an Examination Yuan, and the statute refers to examinations throughout.  It is clear that some kind of competitive examination plays a prominent role in job ranking and title.  However, in its review of the statute, the Court could not find any clause which stated that sitting for an examination was the sole means by which to become a civil servant.  In fact, in its reading of the statute, the Court cannot come to a clear determination of how individuals are chosen to become part of the civil service of Taiwan.  Its best guess is the definition in the Enforcement Rules, pointed out by Lee, which refers to "organic laws of each respective agency."  (Doc. No. 23, Ex. 1, at 17.)  This definition of civil service seems to suggest that the relevant governmental agencies are responsible for maintaining some set of rules under which they hire civil servants.  The Court has not been presented with any such rules promulgated by the agency that oversees TECRO, presumably the Taiwanese Ministry of Foreign Affairs.

The evidence on this point is, unfortunately, inconclusive.  The Court is unable to use Taiwanese law to inform its opinion of whether Lee was a civil servant.  Given

Defendant's overall burden of showing that Lee was a civil servant, the Court resolves this factor in Lee's favor.

### 2. What was Lee's job title? Has he ever been employed previously in any capacity with the Taiwanese or Chinese government?

TECRO contends that, based on the classification system, Lee's job title was "chauffeur." Lee disagrees, asserting that he did not have an official title and instead served as a general maintenance worker. Both parties agree that Lee had not been previously employed by the Taiwanese or Chinese government.

The Court believes that, even assuming TECRO's job title designation is correct, nothing about Lee's job title as a chauffer clearly indicates that he was a civil servant. There is nothing about Lee's job title that has recognized markers of civil service, such as involvement with political deliberations or a title that indicates he was part of the Taiwanese government. *See Segni v. Commercial Office of Spain*, 835 F.2d 160, 165 (7th Cir. 1987). In addition, Lee was not previously employed in any position with either the Taiwanese or Chinese government, so the Court rules out the possibility that he was transferred to TECRO from any other government position. Thus, the Court resolves this factor in favor of Lee.

### 3. How was Lee hired with the TECRO office and on what terms? Did he apply for the job? Did he take any competitive exams? Did he have a contract with TECRO once he began his employment?

TECRO assert that Lee was hired in 1992. He was recommended to the position by a "Taiwanese overseas expatriate leader" and was not hired through a competitive examination process. (Doc. No. 35, at 2.) Lee did not have a contract with TECRO. TECRO believes that Lee filled out an application form and an "intention to work" form

9

pursuant to the rules of the Ministry of Foreign Affairs, but is unable to locate the forms now.

Lee states that he learned of the position from a friend, and filled out an application form. Lee agrees that he did not take any competitive examination in order to be placed with TECRO. He maintains that the application form was not related to Taiwanese civil service; rather, it was an ordinary job application inquiring as to basic information. Lee interviewed with two Taiwanese officials at TECRO, and was hired as an at-will employee. He started his job at a $1500 monthly salary, which slowly increased to $2000/month by the time he left his employment. His workday lasted from 8:30 am to 6:30 pm, and he was paid for overtime hours. TECRO paid a portion of his health insurance premium, but Lee was required to pay most of the premiums. This was Lee's only employment benefit. (Pl.'s Am. Answers Posed by Court's Order of Dec. 8, 2009, Doc. No. 38, at 2-3.)

The Court believes that the information presented tips this factor in Lee's favor. Lee's position was not defined or outlined in a contract or other document. He was interviewed by local TECRO officials before TECRO offered him employment, and TECRO offers no evidence that the decision to employ Lee had to go through certain governmental channels or receive any civil service imprimatur from the Taiwanese Ministry of Foreign Affairs. He took no exam at the time of his employment with TECRO, or, it appears, at any other time during his tenure there. And last, he was paid a modest salary with almost no benefits, and TECRO compensated him for overtime hours. This indicates to the Court that Lee's job was not a civil service job, but was instead a service staff job that any laborer could have filled.

### 4. What is Lee's citizenship?

Lee has dual citizenship. He was born in Taiwan and still holds Taiwanese citizenship. At the time he was hired at TECRO, he was a United States permanent resident. He became a United States citizen in 1999.

The Court posed this question because courts have indicated that a "person hired by his own country's government to work abroad should have a somewhat lesser expectation of suing his homeland in his host nation's courts." *Segni*, 835 F.2d at 165 n.7. This factor is resolved in Lee's favor. On the one hand, he is a Taiwanese citizen, and courts have shown reluctance in opening their doors to foreign government workers suing their sovereigns here. On the other hand, Lee has been an American citizen for over ten years and we would expect him to seek redress in domestic courts. It is clear, however, that Lee was not hired to work abroad—he was already in this country when he sought out employment at TECRO. That fact, in addition to Lee's United States permanent residence status when he became employed at TECRO, convinces the Court that Lee should prevail on this factor.

### 5. What was the nature of Lee's work in the TECRO office?

Although TECRO gives Lee the title of "chauffer," it also acknowledges that Lee's job was classified as a "mixed position." (Doc. No. 35, Ex. 1, ¶ 15.) A mixed position is one that includes job responsibilities from two or more recognized positions, for example, a chauffer and repair person. Within the Ministry's classification system, mixed positions are listed according to the duty or duties performed that an employee performs during a majority of his time. TECRO argues that because Lee drove a majority

11

of the time, he was considered a chauffer, even though he completed other tasks in the office as well.

Lee maintains that he did not have a title, but was instead a general maintenance/repairman who did odd jobs and errands around the office in addition to some driving tasks. Lee asserts that he was not privy to official government information and was not a guest at any official dinners or events. He waited outside at official events. Lee contends that he never performed any work that could be considered official in nature.

The Court finds the information presented here to be the strongest evidence in favor of Lee. From both Lee's and TECRO's accounts of his job responsibilities, Lee had no role in the political deliberations or policymaking decisions of TECRO. He performed menial tasks around the office, waited outside at events, and had no discretionary authority. To the extent Lee "lacked authority to determine or articulate policy and lacked discretion in his duties, he is more like the employees for whom Congress intended FSIA's commercial exception, and less like a civil servant." *El-Hadad v. United Arab Emirates*, 496 F.3d 658, 666 (D.C. Cir. 2007). The Court believes Lee prevails decisively on this factor.

The evidence gathered from all of the factors outlined above suggests that Lee is not a civil servant. Though the inquiry was close at times, the Court believes that TECRO has not met its burden of showing that Lee was employed as a civil servant at TECRO. The Court holds that Lee is not a civil servant.

### B. Is Lee's Work Commercial or Governmental?

The Court must now move to the ultimate question of whether Lee's job responsibilities involved the exercise of "'powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns.'" *Id*. at 667 (quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993)). That is, the Court must determine the ultimate question embodied in the FSIA's "commercial activity" exception: are Lee's job duties commercial or governmental in nature?

The Court believes that Lee's work can only be described as commercial. His tasks as a driver, maintenance and repairman, and errand runner are standard in the commercial world. His duties involved no discretionary duties or involvement with sovereign law or policy. He participated in official events only in the capacity of a service staff member, driving officials to events and waiting outside. The Court believes that Lee's job is one that is commonplace in commercial enterprise. *But see Crum v. Saudi Arabia*, 2005 WL 3752271, at *4 (E.D. Va. July 13, 2005) (following the Second Circuit in rejecting the holding of other courts that the question of whether an employee is a civil servant is an operative one, and finding that a limousine driver's activities did not amount to "commercial activity").

TECRO urges this Court that Lee drove TECRO officers and employees around Houston and the larger region, "assisting [TECRO] as a driver to promote [TECRO's] interests in Houston and the south central United States." (Doc. No. 35, Ex. 1, ¶ 16.) In this statement, TECRO aims to show that the purpose of Lee's work was to assist TECRO in its broader mission in Houston and the surrounding region, thereby giving it a gloss of official government work. Reference to the purpose of Lee's work to show it

13

was governmental is explicitly forbidden by the FSIA, and so the Court may not use this as evidence to rebut the commercial nature of Lee's work. 28 U.S.C. § 1603(d) ("The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.") In applying this FSIA directive to the facts of this case, the Court must "reject[] any argument that rests on the foreign state's *reasons* for undertaking the activity alleged to be commercial," and must instead look "to the resemblance between 'the outward form' of [the employee's] conduct and powers and those of private citizens." *El-Hadad* (quoting *Republic of Argentina v. Weltover*, 504 U.S. 607, 617 (1992)). The outward form of Lee's work indisputably resembles service jobs in the commercial sphere. The Court holds that Lee's employment was commercial rather than governmental. This suit is authorized under the FSIA's "commercial activity" exception.

### III.  CONCLUSION

The Court finds that it has subject matter jurisdiction over this case. The FSIA does not afford TECRO immunity from suit because the relevant activity, Lee's employment relationship with TECRO, falls under FSIA's "commercial activity" exception. 28 U.S.C. § 1605(a)(2). Defendant's Motion to Dismiss and Memorandum in Support (Doc. No. 16) is **DENIED**.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 5th day of March, 2010.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

14

**TO ENSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS ORDER SHALL FORWARD A COPY OF IT TO EVERY OTHER PARTY AND AFFECTED NON-PARTY EVEN THOUGH THEY MAY HAVE BEEN SENT ONE BY THE COURT.**